UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JASON ALLEN CELES,<br><br>Defendant. | No. 1:20-cr-00056-NONE-SKO<br><br>ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS<br><br>(Doc. No. 31) |

Currently pending before the court is the motion to suppress evidence brought on behalf of defendant Jason Allen Celes. (Doc. No. 31.) The court initially heard oral argument on the motion on February 12, 2021, and thereafter held an evidentiary hearing on May 12, 2021 and May 26, 2021, followed by post-hearing argument on the latter date. (Doc. Nos. 38, 48, 54.) At the hearings, Assistant U.S. Attorney Katherine Schuh appeared by video on behalf of the government, attorney Douglas Foster appeared by video on behalf of defendant, and defendant Celes was present by video and in custody. (*Id.*) Having reviewed the parties' submissions, and having considered their oral arguments and the evidence submitted at the evidentiary hearing, for the reasons explained below, the court will grant defendant's motion to suppress evidence.

**BACKGROUND**

The following summary of the relevant facts is based on evidence submitted by the parties attached to their briefing and the testimony and exhibits presented at the two-day evidentiary

1

hearing. Modesto Police Department ("MPD") officers Steven Poortinga and Noe Pena are members of the crime-reduction team in charge of addressing complaints involving quality of life, including drug dealing and theft, in an area of Modesto referred to within the MPD as "Beat 62." Officer Poortinga testified that he has over 20 years of experience as a law enforcement officer and has been with MPD since 2017. He has worked with MPD's crime-reduction team for three years and also has familiarity with investigating drug trafficking crimes. Officer Pena testified that he has been with MPD for nine years, the last three of which have been spent with the crime-reduction team. At some time prior to the events at issue here, the crime-reduction team had been made aware of two or three houses located in Beat 62 associated with criminal activity.[1]

On July 11, 2019, officer Poortinga was driving a marked police vehicle, with officer Pena in the passenger seat, patrolling a residential neighborhood in Beat 62. At about 3:30 p.m. the officers noticed a white Volkswagen, later identified to be driven by defendant Celes, driving slowly. The officers followed the Volkswagen until it made a right-hand turn and parked near the 1900 block of Estep Drive. The officers saw defendant exit his vehicle and approach one of the houses on Estep Drive. Officer Poortinga initially passed the Volkswagen, circled the block, and parked the patrol car several houses behind the Volkswagen. According to officer Pena, it took 30 seconds to circle the block. The officers testified that after gaining a better vantage point, they still did not actually observe defendant Celes. Officer Poortinga testified that he was partially distracted during this period of time, and officer Pena testified he could not actually see which house defendant apparently entered. After about a minute or two, defendant Celes appeared to exit the area of one house and returned to the Volkswagen. Officer Poortinga believed this short stay by defendant at the house on Estep Drive was potentially related to the sale of drugs.

/////

---

[1] Neither officer testified that they saw defendant Celes at the houses in Beat 62 that had been previously associated with criminal activity. Officer Pena specifically confirmed that the places where defendant Celes stopped the Volkswagen on the day in question were not anywhere near the locations of those houses. Moreover, officer Pena testified that he would not characterize Beat 62 or the neighborhood in question as a high crime-rate area, instead describing it as a working-class neighborhood which, like many areas, had some parts that had higher crime rates than other parts.

2

The Volkswagen then drove down Estep Drive. Officer Poortinga was about five to six car-lengths behind the Volkswagen which then made two right turns, the first on Gulfstream Drive and the second on Muncy Drive. Officer Poortinga accelerated his patrol vehicle so as to be directly behind the Volkswagen. Officer Poortinga believed that, at this point, defendant Celes knew he was being followed by a marked police vehicle because he looked back at one point. The Volkswagen then pulled into the driveway at 1905 Muncy Drive. At that point, officer Poortinga stopped his patrol vehicle in the middle of Muncy Drive behind the Volkswagen. It is undisputed that the patrol vehicle was partially blocking the Volkswagen from backing out of the driveway, as well as creating an obstacle for any traffic attempting to travel down Muncy Drive.[2]

After stopping on Muncy Drive, both defendant and officer Poortinga immediately exited their vehicles and approached each other. Officer Pena also got out of the patrol vehicle and approached the passenger sitting in the Volkswagen. Because officer Poortinga did not engage his body camera immediately upon exiting the patrol car, the very beginning of his encounter with defendant was not recorded. Moreover, officer Poortinga did not recall what he said to defendant at the very beginning of their encounter. However, once the body camera started to record video without any audio, officer Poortinga was already in possession of defendant's

/////
/////
/////
/////
/////
/////

---

[2] There is a minor factual dispute between the parties regarding the precise positioning of the patrol car when it stopped in the middle of Muncy Drive. Defendant contends the patrol car was effectively blocking the Volkswagen's path completely. (*See* Doc. No. 31 at 7) ("While [the] patrol vehicle did not completely block [defendant] into the driveway, he effectively did so."). The government asserts that the Volkswagen had a path by which to exit and avoid the patrol car. (*See* Doc. No. 35 at 6) (noting the patrol car parked diagonally on Muncy Drive and "[i]t appears that there was space . . . to exit the driveway into the road."). This minor dispute, however, is immaterial to the court's resolution of the pending motion for reasons explained below.

driver's license.[3]  When the audio of the body camera first started to record, the footage reflects officer Poortinga questioning defendant Celes about potential wrongdoing.  He asked defendant whether he had been arrested before and whether he was worried about having any outstanding warrants, and also warned defendant to keep his hands out of his pockets.  (Gov't Ex. 3, Body Camera Video of Officer Poortinga, "Body Camera") at 0:30–0:59.)  According to officer Poortinga, during this encounter, defendant was nervous, appeared to look for an escape route, and was motioning towards his pockets as though he was attempting to determine if he was in possession of anything illegal.  Very early on, just after defendant replied that he was "not doing anything, sir," officer Poortinga told the defendant not to "run cause I can run faster.  There are dogs around the corner in another car, okay?" (*Id.* at 0:59–1:03.)[4]  Officer Poortinga continued, "We obviously got a problem over in this area so we're coming over here to make sure everything is good." (*Id.* at 1:05–1:09.)   The officer then told the defendant, "I can tell you right now, you've got a problem with drugs over here.  So do you have anything with you you're not supposed to have?" (*Id.* at 1:17–1:25.)  After defendant denied possessing anything illegal, officer Poortinga stated:

> Be straight with me dude.  I'm like a straightforward dude, I – I don't even want to dick around.  If you're legit, you're legit, that's fine.  Whatever.  But if you're dirty right now, just be like, 'Ayo, this is what I've got.'  And I'm cool with that, okay?  Then we can work on whether or not you're going to go to jail or get a ticket, but if you're silly then I straight take you to jail.  Okay?

(*Id.* at 1:29–1:49.)  It was only then that defendant admitted he was in possession of illegal narcotics and that officer Poortinga arrested and searched him.  (*Id.* at 1:49–4:30.)

---

[3]  The parties agree that once a body camera is engaged it is able to capture the prior 30 seconds of video without any audio.  The point at which the audio begins is essentially the point at which the officer engages his or her body camera.  Therefore, because the encounter with defendant was already underway when the body camera footage began to record video without any audio, more than 30 seconds had passed between the very beginning of the encounter and when officer Poortinga engaged his body camera.  When asked at the evidentiary hearing approximately how much of the encounter was not recorded (*i.e.*, the time between his initial contact with defendant until his body camera began to capture video without any audio), officer Poortinga testified that it was only a short time.

[4]  Defendant Celes submitted to and followed that directive by not running or attempting to leave.

The search of the defendant revealed that he was in possession of methamphetamine, heroin, cash, a hypodermic needle, a glass pipe, and some pills. (Doc. Nos. 31 at 4; *see also* 35 at 2–3.) Specifically, 17 grams of heroin and 17 grams of methamphetamine were recovered from defendant's person. (Doc. No. 31 at 4.) The officers then searched the white Volkswagen, discovering two ounces of methamphetamine and a loaded handgun. (*Id.*) MPD officers thereafter searched defendant's residence, locating an additional seven ounces of methamphetamine. (*Id.*) According to the government, in total MPD officers recovered approximately 295 grams of methamphetamine from defendant's person, vehicle, and residence. (Doc. No. 35 at 3.)

Defendant Celes was charged in this case by way of indictment with possession of 5 grams or more of actual methamphetamine and 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and for being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 9.) Defendant Celes has moved to suppress all evidence obtained as a result of his detention and subsequent searches on the ground that he was seized by officer Poortinga without reasonable cause to believe that he was engaged in illegal activity. (Doc. No. 31.) The government opposes that motion to suppress evidence, arguing that the officers' initial encounter with defendant was consensual and, in any event, the encounter did not become a temporary detention or seizure until after a reasonable suspicion of criminal activity had developed. (Doc. No. 35.) Specifically, the position taken by the government following the evidentiary hearing is that the required reasonable suspicion of criminal activity developed before officer Poortinga advised defendant Celes not to run. (*See id.* at 8.)

### LEGAL STANDARD

The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A seizure within the scope of the Fourth Amendment is not automatically found each time a police officer approaches an individual and asks questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). No seizure under the Fourth Amendment takes place so long as a

reasonable person would feel free "to disregard the police and go about his business." *California v. Hodari*, 499 U.S. 621, 628 (1991); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."); *United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013). To measure the consensual nature of an encounter with law enforcement, courts have found that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Bostick*, 501 U.S. at 434 (citation omitted); *see also Brendlin v. California*, 551 U.S. 249, 254 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned."); *Brown*, 996 F.3d at 1005–06 (concluding that a consensual encounter ripened into a seizure when the officer ordered the suspect to "stand up and turn around" thereby asserting authority over the suspect's movements); *McClendon*, 713 F.3d at 1215. However, once an encounter loses its consensual nature, the Fourth Amendment is triggered. *Hodari*, 499 U.S. at 628; *Brown*, 996 F.3d at 1005 ("If the consensual encounter has ripened into an investigatory detention under *Terry*, then the officer must have '"reasonable suspicion"—that is, "a particularized and objective basis for suspecting the particular person stopped" of breaking the law.'" (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014))).

The Fourth Amendment applies to the seizure of a person, including brief investigatory stops, even if that seizure does not rise to the level of an arrest. *Terry v. Ohio*, 392 U.S. 1, 17 (1968). A police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30); *see also United States v. Cortez*, 449 U.S. 411, 417–18 (1981). Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion" in

light of the totality of the circumstances. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (*en banc*); *see also Navarette v. California*, 572 U.S. 393, 396–97 (2014); *Brown*, 996 F.3d at 1006; *United States v. Valdes-Vega*, 738 F.3d 1074, 1078–79 (9th Cir. 2013). The reasonable suspicion standard is intentionally abstract and courts are to give "due weight" to the factual inferences drawn by law enforcement officers. *United States v. Arvizu*, 534 U.S. 266, 273–77 (2002) (citation omitted); *see also United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) ("Reasonable suspicion 'is dependent upon both the content of information possessed by police and its degree of reliability,' and '[t]he standard takes into account the totality of the circumstances—the whole picture.'" (quoting *Navarette*, 572 U.S. at 397)).

**ANALYSIS**

Defendant Celes seeks suppression of all evidence obtained as a direct result of his seizure and the subsequent searches of his vehicle and residence. Defendant admitted that he was in possession of drugs during his encounter with officer Poortinga in response to the officer's questioning and it was thereafter that the searches and seizures of drugs and the handgun took place. Therefore, the court must determine whether defendant had been seized prior to his statement admitting his possession of drugs and, if so, whether that seizure was supported by a reasonable suspicion of criminal activity afoot and was thus lawful under the Fourth Amendment. As explained below, the court concludes that defendant was seized without reasonable suspicion prior to his admission of being in possession of drugs.

**1.      Defendant Was Seized When He Was Ordered Not To Run By Officer Poortinga**

A seizure under the Fourth Amendment occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." *United States v. Al Nasser*, 555 F.3d 722, 728 (9th Cir. 2009) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989)). The Ninth Circuit has identified five factors in determining "whether a reasonable person would have felt at liberty to ignore the police presence and go about his business." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (quoting *Orhorhaghe v. I.N.S.*, 38 F.3d 488, 494 (9th Cir. 1994)). The factors are

/////

7

> (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter.

*Id.* Here, the parties dispute whether officers Poortinga and Pena seized defendant "when the officers first approached his vehicle." (*See* Doc. Nos. 31 at 5; 35 at 3–7.) Based upon the evidence presented in connection with the pending motion, the court concludes that officer Poortinga seized defendant no later than the moment he directed defendant not to run, warning him that police dogs were around the corner. Several facts, which arose before and during the encounter, support this conclusion.

The officers' conduct, even before the initial encounter began, weighs heavily in favor of finding that defendant Celes was seized at least by the time he was directed not to run and warned of the presence of police dogs. As noted above, officers Poortinga and Pena observed defendant's Volkswagen travelling through a residential neighborhood around 3:30 p.m. After following him and seeing defendant stop at a house on Estep Drive, the officers passed the Volkswagen in their marked police vehicle and circled the block to observe from several houses down. When defendant departed after a couple of minutes apparently from that house, officer Poortinga quickly accelerated his marked police vehicle to get directly behind the Volkswagen. After defendant pulled into a driveway, officer Poortinga stopped his police vehicle, according to both officers' testimony, in the middle of Muncy Drive. It is undisputed that the Volkswagen was at least partially blocked by the police vehicle. At the evidentiary hearing, it was made clear that if defendant had wished to leave, he would have needed to maneuver through a tight space to do so. This finding is supported by officer Pena's body camera, depicting the obtrusiveness of the police vehicle in the middle of the road. (*See* Doc. Nos. 40-2, 40-3, 40-4.) Accordingly, the court finds that officer Poortinga acted in an "officious or authoritative manner" when he stopped his marked patrol vehicle in the middle of Muncy Drive, obstructing traffic and defendant's vehicle in the

/////
/////
/////

8

process, just after quickly accelerating directly behind the Volkswagen that was travelling in a residential neighborhood during the afternoon. *See Orhorhaghe*, 38 F.3d at 494.[5]

Second, officer Poortinga's aggressive conduct throughout the encounter suggests that defendant Celes was not free to walk away. After both cars came to a stop on Muncy Drive, defendant and officer Poortinga exited their vehicles and approached one another. Just seconds into their encounter, officer Poortinga had already taken possession of defendant's identification. For the next 30 seconds, officer Poortinga held onto defendant's identification while defendant appears on the video to be answering officer Poortinga's questions. After the body camera begins recording audio, a little over 30 seconds into the encounter, officer Poortinga questioned defendant regarding his prior criminal history. This questioning lasted for another 30 seconds. Therefore, officer Poortinga obtained defendant's identification within a few seconds of the encounter beginning, held onto it while asking defendant intrusive questions, and never returned, or even appeared to suggest he was prepared to return, defendant's identification at any point during the encounter. *See United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (holding that if an officer "retains control of a person's identification papers, such as . . . a driver's license, longer than necessary to ascertain that everything is in order, and initiates further inquiry while holding on to the needed papers, a reasonable person would not feel free to

---

[5] The government suggests that this initial contact was a routine police-citizen encounter in which the officers simply approached an already parked vehicle—citing cases holding that when an officer cordially approaches a suspect in a parked vehicle and the suspect is unaware he is being targeted, the suspect is not seized when the officer blocks his vehicle with a police car. Such encounters, the government asserts, involve no show of authority sufficient to lead a reasonable person to believe he cannot decline to talk to the approaching officer. Some of these cases find dispositive whether the suspect was completely blocked from terminating the encounter, which would indicate a greater show of authority even in connection with seemingly otherwise routine encounters. But here, "before the verbal encounter even began, this case lacked a traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of the police officer." *See United States v. Jones*, 678 F.3d 293, 300 (4th Cir. 2012); *id.* at 295, 297 ("Two police officers, in a marked patrol cruiser, closely followed a car from a public road onto private property, and then blocked the car's exit" by stopping and parking "the police cruiser in the lane of traffic. . ."). In these situations, the crucial inquiry is not whether the police completely blocked a suspect. *See id.* at 301 at n.4 (rejecting the argument that the suspect was not completely blocked and had one avenue to leave because "no reasonable law-abiding person would take such evasive action in the presence of police officers, and certainly not when the officers have just finished closely following that person's vehicle"). Here, officer Poortinga's conduct even before he encountered the defendant outside the Volkswagen is a fact that weighs in favor of finding that a seizure occurred at least by the time the officer directed the defendant not to run.

depart."). Further, officer Poortinga never informed defendant that he was free to refuse answering any questions or leave, and in fact, the statements made by the officer to defendant set forth above conveyed quite the opposite. *See Washington*, 387 F.3d at 1068; *United States v. Patino*, 649 F.2d 724, 727 (9th Cir. 1981) ("Although . . . it is not essential that she have been told and that she understood that she could refuse [to stop and answer questions], this is a factor that may be taken into consideration in determining whether she reasonably believed that she was free to leave."). The first minute of this encounter supports a finding that a reasonable person in defendant's position would not have felt free to simply disregard the officer and leave, regardless of officer Poortinga's directive to defendant not to run which was made shortly thereafter.

Third, as just noted, officer Poortinga issued his directive relatively early into the encounter. Specifically, approximately a minute after the encounter began, officer Poortinga directed defendant not to run, advised that he (Poortinga) could run faster than defendant, and that police dogs were nearby if defendant disregarded that directive and fled.[6] The Ninth Circuit has held that for a seizure to occur after an officer's instruction not to run, "a suspect must do more than halt temporarily . . ." *McClendon*, 713 F.3d at 1215–16 (quoting *United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007)). However, here, defendant Celes satisfied this standard by fully complying with officer Poortinga's command not to run. Defendant's "actual submission" to officer Poortinga's "show of authority" constituted a seizure under the Fourth Amendment. *See Brendlin*, 551 U.S. at 254; *see also Horadi D.*, 499 U.S. at 626. Indeed, the government appears to concede that at the point defendant was told not to run, the encounter was no longer voluntary but instead subject to Fourth Amendment protections. (*See* Doc. No. 35 at 5–6 ("Although the initial encounter was not a stop . . . [b]y the time Officer Poortinga advised Celes not to run, there was reasonable suspicion for a brief investigatory stop").) Therefore, officer Poortinga's directive to defendant not to run, and his threat of police dogs around the corner,

---

[6] The government argues that officer Poortinga's advisement to defendant that he should not run was "not the equivalent to telling him that he was required to stay." (*See* Doc. No. 35 at 7 n.1.) The government provides no authority for this proposition. Even if it did, the circumstances of this encounter made clear that defendant Celes was not free to leave when he was advised not to run, unless he desired to leave without his identification and meet officer Poortinga's police dogs upon his departure.

10

clearly constituted a seizure in this case.

Based upon all of the evidence presented in connection with the pending motion and considering the totality of the circumstances involved, the court concludes that at the very latest, defendant Celes was seized for Fourth Amendment purposes no later than the moment he was directed by officer Poortinga not to run.[7]

## 2. Officer Poortinga Lacked Reasonable Suspicion To Seize Defendant

Having determined that a Fourth Amendment seizure occurred, the second question is whether that seizure was supported at the time it took place by reasonable suspicion in keeping with the Fourth Amendment. The government argues that the seizure of defendant was supported by reasonable suspicion based on officer Poortinga's: (1) knowledge of criminal activity in Beat 62; (2) belief that defendant's approximate two-minute stay at some residence on Estep Drive and pulling into a driveway on Muncy Drive shortly thereafter was consistent with drug trafficking activity based on officer Poortinga's experience; and (3) defendant's alleged nervousness after the encounter with police began. (Doc. No. 35 at 7.) Defendant argues that each of the factors cited

---

[7] As will become clear from the discussion below, the court need not decide whether defendant was seized before the directive not to run and instead at the moment officer Poortinga engaged his body camera, because it would have no impact on the resolution of the pending motion. However, if required to do so the court would conclude that officer Poortinga seized defendant Celes within approximately 30 seconds of encountering him and thus almost 30 seconds before defendant was told not to run. (*See* Body Camera at 0:30–1:03.) This conclusion is supported by the events discussed above and also officer Poortinga's own account. At the evidentiary hearing officer Poortinga explained that he turned on his body camera because at that moment he believed his interaction with defendant was going "from like a consensual encounter of me having a conversation with him to, hey, *you're not free* to leave and I've got to record all this." (Doc. No. 50 (5/12/21 Hr'g Tr.) at 35 (emphasis added).) When later asked why he waited to activate his body camera rather than do so when he exited his patrol car, officer Poortinga confirmed his reasoning, stating: "Because at that point in time, my casual conversation or my contact with him was turning from, 'Hey, I just want to have a conversation with you' to, well, this is a little bit more and at this point in time I'm not just going to walk away from this. I need to get further information of why you're here and what you're doing." (*Id.* at 61.) Finally, on cross-examination officer Poortinga testified that when he pulled behind the Volkswagen and stopped his police car in the middle of Muncy Drive, he wanted to "resolve [his] suspicions." (*Id*. at 59.) In the court's view, officer Poortinga essentially conceded that it was his intention to seize defendant once he activated his body camera, a point prior to his directive to the defendant not to run, and likely approximately 30 seconds into the encounter. *See Al Nasser*, 555 F.3d at 728 (requiring "governmental termination of freedom of movement through means intentionally applied" (quoting *Brower*, 489 U.S. at 596–97)).

11

by the government, analyzed together, do not support a finding of reasonable suspicion justifying his seizure under the law. (*See* Doc. No. 36 at 3–5.) The court agrees with defendant and concludes that his seizure by officer Poortinga violated the Fourth Amendment because it was not supported by a reasonable suspicion that unlawful activity was afoot.

First, the government argues that the officers' familiarity with and knowledge of the specific neighborhood at issue as being "known for narcotics activity" supports a reasonable suspicion that defendant Celes was engaged in criminal activity. (Doc. No. 35 at 7; *see also* Gov't Ex. 2, Map of Residential Neighborhood).) However, the suggestion that Beat 62 or the neighborhood at issue was a crime-prone area is unsupported by the evidence presented in this case. Officer Pena declined to characterize Beat 62 or the neighborhood as a high crime-rate area, describing it instead as a working-class neighborhood in which some parts had more crime than others, just as in many areas. Officer Poortinga testified that MPD's crime-reduction team was "notified about" about "a couple" of houses in the area apparently associated with some unidentified criminal activity, but he did not provide specifics. Officer Pena testified that he knew of three houses in the "general vicinity" that were brought to his attention as being drug houses. He also testified that he was not investigating any specific areas on the day in question. When the government argues that a particular crime-prone area gives rise to reasonable suspicion, courts must examine the evidence carefully to ensure that the description is "properly limited" to "specific, circumscribed locations where particular crimes occur with unusual regularity." *Montero-Camargo*, 208 F.3d at 1138. Two or three houses, which *may* have been associated with unidentified criminal activity, in the entire area does not make any portion of it particularly crime-prone. The unsupported assertion that Beat 62 or the specific neighborhood in question is "known for narcotics activity" cannot therefore be credited on this record and cannot form any

/////
/////
/////
/////
/////

part of the analysis in determining whether defendant's seizure was supported by reasonable suspicion of criminal activity.[8]

Second, the government argues that defendant's two-minute stay at the residence on Estep Drive was, in officer Poortinga's prior experience as a law enforcement officer, "consistent with narcotics trafficking." (*See* Doc. No. 35 at 8.) Nonetheless, the court finds that defendant's stop on Estep Drive was nothing out of the ordinary, which is confirmed by the evidentiary hearing testimony of both officers. A defendant's short stay at a house, with no other indicia of illegality associated with that stay, may not "form a part of a reasonable suspicion analysis, let alone a basis in itself for a reasonable suspicion finding." *United States v. Thomas*, 211 F.3d 1186, 1191 (9th Cir. 2000) (describing the defendant's conduct in that case as "[t]he unremarkable comings and goings" to a house). That is exactly what happened here. Defendant apparently stopped at an unidentified house on Estep Drive for no more than two minutes. The officers obviously could not see what defendant was doing during the 30 seconds it took for officer Poortinga to circle the block and gain a better vantage point. Moreover, after circling the block and parking, the officers testified that they could no longer see the defendant or what he was doing at the house he had presumably entered. Officer Poortinga also testified that while defendant may have been talking to someone at the house, the officer could not say so with any certainty because his "attention was obviously diverted by radio traffic" and "talking with [his] partner about what was going on." (Doc. No. 50 (5/12/21 Hr'g Tr.) at 27.) Officer Pena testified that he could not even identify the particular house associated with defendant's stop. For the short period of time when the officers had the ability to observe defendant's behavior, they saw nothing, let alone anything suspicious. (*See* Doc. No. 35 at 8 (arguing reasonable suspicion exists in part because officers saw defendant

---

[8] If the court concluded that a part of Beat 62 was crime-prone—which, to be sure, it does not— "the government provides no factual basis to support a belief that the area around [Estep Drive and Muncy Drive] is particularly crime-ridden." *United States v. Harger*, 313 F. Supp. 3d 1082, 1094 (N.D. Cal. 2018). Officers Poortinga and Pena never testified about known criminal activity where defendant stopped on the day in question, and officer Pena testified that defendant was not near any of the houses in the area that had been identified by MPD's crime-reduction team. The officers' attempts to rely on two or three houses involved in drug activity, in an otherwise working-class neighborhood, is precisely what the Ninth Circuit has instructed courts not to accept at face value.

13

get out of his car, "go to the front of the residence," and then return).) The "unremarkable coming[] and going[]" from the residence on Estep Drive could not have permissibly formed any part of a reasonable suspicion of criminal activity given this evidence. *See Thomas*, 211 F.3d at 1191.[9]

The government also argues that defendant's stop on Muncy Drive can form a part of the reasonable suspicion analysis. (Doc. No. 35 at 8.) The government has not cited any case in which a court has found that similar driving behavior—where a suspect, who is being closely followed by a marked police car in a residential neighborhood, pulls off into a driveway—served as a basis for a finding of reasonable suspicion. Nonetheless, the court will consider defendant's decision to park in the driveway on Muncy Drive—in light of all the other circumstances—in determining whether officer Poortinga had reasonable suspicion of criminal activity when he seized the defendant.

Third, the government argues that defendant was "nervous and fidgety, and looked from side to side as though he was going to run" when talking with officer Poortinga. (Doc. No. 35 at 8.) Having viewed the body camera recording and in light of the applicable case law, the court rejects the argument that the officer's observations in this regard could contribute to the finding of a reasonable suspicion of criminal activity. *See United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001) ("Encounters with police officers are necessarily stressful for law-abiders and criminals alike. We therefore hold today that nervousness during a traffic stop—even the extreme nervousness Chavez-Valenzuela exhibited here—in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity."), *overruled on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005); *United States v. Mati*, 466

---

[9] Of course, an otherwise innocuous stop at a residence may nonetheless give rise to reasonable suspicion of criminal conduct if accompanied by "observations of evasive or erratic driving tactics or other furtive conduct by people coming to and going from a particular residence." *Thomas*, 211 F.3d at 1190–91. But that is not what occurred here. Neither officer asserted that defendant was violating any traffic laws on the day in question, nor did they claim that he was driving erratically. The court reiterates how little the officers actually observed when defendant stopped on Estep Drive. They simply did not see any objective indicia that criminal activity might be afoot.

14

F. Supp. 3d 1046, 1060 (N.D. Cal. 2020) ("[N]ervousness is a weak basis for reasonable suspicion."). Moreover, in the court's view, defendant does not appear to be particularly nervous on the body camera video footage. Although he looked away several times during the encounter, possibly considering how to answer officer Poortinga's questions (two which occurred when he inhaled or exhaled from his cigarette), defendant made direct eye contact with the officer when he actually answered his questions. Even if defendant displayed some nervousness, it was no more than the nervousness any law-abiding person would display if they were confronted by law enforcement in the aggressive manner in which officer Poortinga confronted defendant after stopping his vehicle and disembarking in the middle of the street. Thus, any slight nervousness on defendant's part carries very little weight in the determination of whether reasonable cause to believe criminal activity was afoot existed here.

In arguing that officer Poortinga had reasonable suspicion that defendant was engaged in criminal activity, the government does not cite a case with facts analogous to those present here. Instead, the government relies on the Supreme Court's decision in *Terry* and the Ninth Circuit's decision in *United States v. Crapser*, 472 F.3d 1141 (9th Cir. 2007). (Doc. No. 35 at 7–8.) The government does not even attempt to analogize the facts of this case to *Terry*, where there, an officer observed suspects for over 10 minutes peer into a store window and regroup around the corner to discuss—conduct that was repeated almost a dozen times. *See* 392 U.S. at 5–6. The government's reliance on *Crapser* is similarly misplaced. There, reasonable suspicion was founded on the officer's belief that the suspect owned a pressure cooker which was indicative of methamphetamine production, he was staying at a motel room with a woman who admitted that she used methamphetamine, and, after police knocked on the motel room door where the suspect was staying, they heard the movement of items for roughly two minutes before the door finally opened. 472 F.3d at 1143–44. The suspect in *Crapser* was also extremely nervous according to the evidence in that case. Two officers observed that the suspect "was very nervous and that his hands were shaking" which "contrasted sharply with his calm demeanor during a 20-minute traffic stop by these same officers about a week earlier." *Id.* at 1144. A third officer observed that "an artery was visibly pulsating in [the suspect's] neck." *Id.* Simply put, the cases relied

15

upon by the government do not support the contention that reasonable suspicion justifying defendant's seizure existed prior to officer Poortinga's directive to defendant not to run.

The totality of the circumstances in this case reflects that defendant was driving during the middle of the day in a residential neighborhood, he stopped at one house but the officers could not see what he was doing, he drove away from the first house and pulled into the driveway of a second house after being closely followed by a marked police car, he immediately engaged officer Poortinga on foot, and then he became (at most) slightly nervous while questioned. Looking to the circumstances and evidence as a whole and deferring to the reasonable inferences drawn by the officer based upon his experience, the court concludes that no reasonable suspicion based upon specific, articulable facts justifying the seizure of defendant Celes existed at the point he was directed by the officer not to run. Accordingly, defendant's seizure violated the Fourth Amendment.

**3. The Evidence Seized From Defendant's Person, Vehicle, And Residence Must Be Suppressed**

As noted above, the officers' searches of defendant Celes' person, vehicle, and residence—which revealed 300 grams of methamphetamine and a handgun—flowed directly or indirectly from defendant's incriminating statement that he possessed narcotics which was made after he was seized without reasonable suspicion.

"Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." *McClendon*, 713 F.3d at 1215. "It is well established that the Fourth Amendment's exclusionary rule applies to statements and evidence obtained as a product of illegal searches and seizures." *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir.2004) (*en banc*); *see also Wong Sun v. United States*, 371 U.S. 471, 485 (1963). To be admissible, incriminating statements made as a result of an illegal seizure must "be 'sufficiently an act of free will to purge the primary taint' of the initial constitutional violation." *United States v. Ramirez*, 976 F.3d 946, 959 (9th Cir. 2020) (quoting *Wong Sun*, 371 U.S. at 486). To determine whether evidence obtained is purged of the primary taint of illegality, courts

consider three factors: "temporal proximity," "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Id.* at 960. "The government has the burden of showing that the taint of constitutional violation is attenuated such that the evidence is admissible." *Id.*[10]

The government has not argued that, if the court were to determine that the defendant was unlawfully seized due to the lack of a reasonable suspicion that criminal activity was afoot, any of the evidence subsequently seized from his person, vehicle, or residence is nonetheless admissible. (*See passim* Doc. No. 35.) Nor does it appear from the record before the court on the pending motion that the government could advance a colorable argument in that regard. Therefore, the government has failed to carry its burden. *See Ramirez*, 976 F.3d at 960; *see also United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (requiring the government to prove by a preponderance of evidence that the inevitable-discovery exception applies); *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 706 (9th Cir. 2009) (placing the burden on the government to prove the good-faith exception to the exclusionary rule applies). Defendant's statement to officer Poortinga that he was in possession of drugs was obtained as a direct result of the illegal seizure of defendant. Only a brief amount of time passed between the illegal seizure of the defendant and the making of the incriminating statement and the searches that followed—with no intervening circumstances. *United States v. Washington*, 490 F.3d 765, 777 (9th Cir. 2007) (finding that consent to search vehicle, even if voluntarily given, "did not purge the taint of [the] illegal seizure"). All of the evidence seized as a result of the searches of defendant's person, vehicle, and residence are therefore subject to suppression.

---

[10] Defendant requests the court to exclude from the government's case-in-chief "all statements" made by defendant in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981). (Doc. No. 31 at 2.) However, statements made following an illegal seizure are governed by the Fourth Amendment. *See Ramirez*, 976 F.3d at 959–60; *United States v. Bocharnikov*, 966 F.3d 1000, 1003–04 (9th Cir. 2020) ("[W]hen a confession results from certain types of Fourth Amendment violations (rather than a Fifth Amendment violation), the government must go beyond proving that the confession was voluntary—it must also 'show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.'" (quoting *Oregon v. Elstad*, 470 U.S. 298, 306 (1985))). The decision in *Edwards*, on the other hand, concerns violations of the Fifth Amendment during custodial interrogations and does not apply under the circumstances of this case.

**CONCLUSION**

For all of the reasons set forth above, the motion to suppress evidence brought on behalf of defendant Celes (Doc. No. 31) is granted in its entirety. All of the evidence obtained as a result of defendant's seizure in violation of the Fourth Amendment is hereby suppressed. This case is set for a status conference before the undersigned on June 11, 2021 at 9:30 a.m. to determine how the government wishes to proceed in light of this order. If, after conferring, the parties are in agreement that such a status conference is unnecessary or should be conducted on another date, the court invites them to submit a proposed stipulation and order.

IT IS SO ORDERED.

Dated: **June 4, 2021**

UNITED STATES DISTRICT JUDGE